IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**MINDY SUE ELLIOTT,**                              Case No. 5:17 CV 2140

        Plaintiff,

        v.                              Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

        Defendant.                              MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Mindy Sue Elliott ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB") and supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 13). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB and SSI in February 2014, alleging a disability onset date of September 7, 2012. (Tr. 240-47). Her claims were denied initially and upon reconsideration. (Tr. 102-03, 158-59). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 183-84). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on April 19, 2016. (Tr. 39-73). On June 2, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 20-33). The Appeals Council denied Plaintiff's request for

review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on October 10, 2017. (Doc. 1).

FACTUAL BACKGROUND[1]

Personal Background and Testimony

Born in 1979, Plaintiff was 33 at her alleged onset date, and 36 at the time of the ALJ's decision. *See* Tr. 240. She alleged disability due in part to a herniated disc with radiculitis, spinal degeneration, a bulging disc with fissure, arthritis of the spine, stenosis of the spine, muscle cramping, and back/leg spasms. (Tr. 269).

In a July 2014 function report, Plaintiff stated she was unable to stand or sit for any period of time (Tr. 289), and needed help with dressing and showering (Tr. 290). She reported doing chores such as dusting and sorting laundry once per week for about fifteen to twenty minutes and shopping once per week for approximately an hour. (Tr. 291-92). Plaintiff stated she had limitations in lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, and climbing stairs. (Tr. 294). She estimated she could take 30 to 40 steps before stopping to catch her breath, stand for five minutes, and sit for fifteen to thirty minutes. *Id.*

At the April 2016 hearing, Plaintiff testified she lived with her parents and two children (ages ten and sixteen). (Tr. 44-46). Plaintiff had a driver's license but did not drive due to side effects of her pain medication and difficulty twisting. (Tr. 46).

---

1. The undersigned summarizes only the evidence relevant to the ALJ's consideration Plaintiff's physical impairments because Plaintiff does not challenge the ALJ's determination regarding her mental impairments. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) (arguments not raised in opening brief deemed waived).

Plaintiff had previously worked as a medical assistant and STNA[2], and injured her back working with a patient. (Tr. 47-48). She had multiple back surgeries, each of which provided temporary, but not lasting improvement. (Tr. 50-51). After bunion surgery, Plaintiff used a knee scooter, but continued to use it for her back pain. (Tr. 52-53, 62).

Plaintiff testified she could not work due to pain and inability stand for long periods of time. (Tr. 50). Her back pain was aggravated by the cold (Tr. 52), and she had continued right foot pain (Tr. 52-53).

Prior to her injury, Plaintiff enjoyed backpacking and camping. (Tr. 56-57). Plaintiff testified to hunting from her father's hut. (Tr. 63). The hut was designed so one could rest a gun on a railing, rather than holding it. *Id.* After shooting a deer, her father had a four-wheeler with a winch to lift the deer onto the four-wheeler. *Id.* Plaintiff testified that when she shot a deer, her parents retrieved it and skinned it; Plaintiff did not lift anything. (Tr. 64-65).

On a typical day, Plaintiff would get up, sit in her recliner with her legs elevated, and prepare simple meals. (Tr. 57). Her ten year old did online schooling from home; her mother helped with this. (Tr. 57, 67). Plaintiff did not need help showering or dressing. (Tr. 58) ("I probably should, but I don't."). She did her laundry occasionally with help from her children; her mother did the grocery shopping. *Id.* She could not lift anything heavier than a milk jug. (Tr. 60-61). Prior to using the knee scooter, Plaintiff always used crutches or a walker. (Tr. 62).

Just prior to the hearing, Plaintiff had a consultation for a spinal cord stimulator. (Tr. 47).

---

2 "State Tested Nurse Aide". *See* www.nursing.ohio.gov/NurseAssist.htm.

<u>Relevant Medical Evidence</u>

*Prior to Alleged Onset Date*

In March 2011, Plaintiff underwent back surgery after suffering an injury at work. (Tr. 333-35). Pre-surgery notes indicate Plaintiff had a previous discectomy at L5-S1 in February 2008, and a 2011 MRI suggested degenerative disc disease at L4-L5 and L5-S1. *Id.* Notes also indicate an apparent "small recurrence of left paracentral disc herniation at L5-S1 with left S1 radicular impingement." *Id.* On pre-surgical examination, Mark Cecil, M.D., noted Plaintiff had a positive straight leg raising test at approximately 30 degrees of hip flexion, worse with ankle dorsiflexion. (Tr. 336). She also had mild weakness in the gastrocnemius muscle on the left. *Id.* Plaintiff thus underwent an inferior hemilaminotomy, revision type, at L5-S1, with a revision discectomy at L5-S1. (Tr. 333, 337).

One month after back surgery, Plaintiff returned to Dr. Cecil reporting increasing lower back pain. (Tr. 346-48). An MRI showed: slight loss of disc height and signal with a central disc protrusion at L3-L4, degenerative disc disease with loss of disc height and a central disc protrusion at L4-L5, abnormal soft tissue ventrally and laterally on the left side around the S1 nerve root, and an abnormal fluid collection from about L4-L5 into the upper sacrum. (Tr. 351-52). Mark E. Coggins, M.D., performed irrigation and drainage of the fluid. (Tr. 344).

A June 2012 CT scan of Plaintiff's lumbar spine revealed degenerative changes at L5-S1 (severe) L4-L5 (moderate), and L3-L4 (mild), as well as contrast extravasation along the ventral thecal sac or ligament. (Tr. 379-80).

*After Alleged Onset Date*

In May 2013, at a visit with Jon Seager, M.D., for mental health issues, Plaintiff reported chronic lower back pain and that she regularly saw a pain management physician. (Tr. 411).

In September 2013, Plaintiff saw Scot D. Miller, D.O., for low back pain radiating to both legs with numbness and tingling in the left leg, and numbness in the right hip. (Tr. 392). Plaintiff tried pain medication, physical therapy, epidurals, and surgery. *Id.* On examination, Dr. Miller noted Plaintiff "mobilize[d] slowly" and had a "definite slow pattern to her gait without antalgia." (Tr. 393). Her hip motion was normal, but she had hip flexor weakness. *Id.* "The remaining motor gross L2-S1 [were] strong, except for bilaterally weak EHL at 4/5." *Id.* Plaintiff had diffuse lumbar tenderness with spasm. *Id.* Imaging revealed "moderate to significant" lumbar degenerative disc disease at L5-S1, congenital lumbar stenosis, and mild lumbar scoliosis. (Tr. 391).

A November 2013 lumbar spine MRI showed degenerative disc disease at L5-S1, and disc protrusions at L5-S1, L4-L5, and L3-L4, T12-L1, and T11-12. (Tr. 397). Dr. Miller later stated the MRI "did not reveal significant degeneration, but there is a degree of facet disease at the L3-L4 level." (Tr. 400). Dr. Miller noted Plaintiff was "considerably symptomatic", despite having short-term symptom relief after her initial surgery. (Tr. 399). On examination, Plaintiff had a normal gait, and normal back strength. *Id.* She had limited lumbar motion and diffuse lumbar tenderness, but negative femoral stretch and straight leg raising tests. (Tr. 400). Plaintiff's discogram revealed a painful disc with pain reproduction at L3-L4. *Id.*

Later that month, Plaintiff saw Michael Rivera Weiss, M.D., at Universal Pain Center. (Tr. 437-39). Plaintiff reported a pain level of 8/10 with medication and 10/10 without medication. (Tr. 437). On examination, Plaintiff had back muscle tenderness and spasms. *Id.* She had restricted range of motion, and a "mild-moderate" antalgic gait. *Id.*

In December 2013, chiropractor Curtis Arny, D.C., completed a form for workers' compensation indicating Plaintiff could not work from November 1, 2013 through February 1, 2014. (Tr. 430). Three months later, Dr. Arny completed a questionnaire for the Social Security

Administration. (Tr. 428-29). He stated Plaintiff had low back pain radiating into her legs causing difficulty with prolonged standing and walking. (Tr. 429). Plaintiff had diminished sensation in her right calf and feet, and decreased range of motion in her lumbar spine. *Id.* She used a cane "as needed" and had a right-sided limp due to weakness. *Id.* Dr. Arny stated Plaintiff had "failed" back surgery, and her surgeon thought she should have a fusion, but was waiting due to Plaintiff's age. *Id.* He opined Plaintiff's use of her feet was limited due to diminished sensation and weakness. *Id.*

At an April 2014 psychological consultative examination, Plaintiff reported a daily routine of personal hygiene, taking her children to school, sitting and watching television, and "occasionally attempt[ing] to do some household chores." (Tr. 453). She also reported "some . . . cooking and cleaning" and occasional shopping. *Id.* The consultant noted Plaintiff used a cane and had some difficulty changing positions from sitting to standing. (Tr. 454).

In May 2014, Plaintiff underwent another low back surgery with Dr. Miller: a revision hemilaminectomy at L3-L4, L4-L5, and L5-S1 for discectomy, lateral recess decompression, partial facetectomy, and foraminotomies. (Tr. 468). Dr. Miller noted recurrent lumbar disc herniations, neural compression, and lateral recess narrowing and compression, secondary to disc protrusion and degenerative factors. (Tr. 468-69). Two weeks later, Plaintiff was "doing okay" and using a walker for support. (Tr. 472). She had numbness and tingling in both legs, and occasional radicular symptoms. *Id.* On examination, Plaintiff transitioned from sitting to standing without difficulty and walked with mild flexion posture using a wheeled walker. *Id.*

In June 2014, Plaintiff began pain management treatment with Marisa Wynne, D.O. (Tr. 998). Plaintiff reported back pain worsened by long periods of standing or sitting, lifting, using stairs, or changes in temperature. *Id*. She reported physical therapy in 2013 aggravated her pain, while medications and epidural steroid injections helped. (Tr. 998-99). On examination, Plaintiff

rose from a seated position with mild difficulty, and moved around the room without difficulty. (Tr. 999). She had tenderness to palpation in her paravertebral muscles, decreased range of motion in her lumbar spine, but normal motor strength and normal gait. (Tr. 1000). Plaintiff returned to Dr. Wynne twice the following month, reporting continued pain. (Tr. 990-96). She was unable to tolerate a straight leg test due to pain, had tenderness and decreased range of motion in her lumbar spine, normal motor strength and gait, and mild difficulty rising from a seated position; she moved around the room without difficulty. (Tr. 991, 995).

Plaintiff was hospitalized for a surgical wound infection in August 2014. *See* Tr. 478-565. An MRI revealed multilevel degenerative changes, most notably at L3-L4 through L5-S1, including contact of the L5-S1 disc bulge with the left S1 nerve root. (Tr. 561). Dr. Miller performed an irrigation and debridement of Plaintiff's lumbar area. (Tr. 520-21).

At a visit shortly after the hospitalization, Dr. Seager noted Plaintiff's gait was "slow and steady" with a walker. (Tr. 1041-43). Two days later, Plaintiff was admitted to the hospital for a week due to acute renal failure. *See* Tr. 570 (discharge summary). Plaintiff was again hospitalized due to septic shock the following month. *See* Tr. 632 (discharge summary). An x-ray revealed borderline disc space narrowing at L4-L5. (Tr. 704). An MRI showed mild degenerative and postsurgical changes, as well as fluid collection in the soft issues overlying the laminectomy sites. (Tr. 697). Specifically, it showed: 1) small central disc herniation, narrowing of the central canal, and mild degenerative facet changes at T11-T12; 2) no sizable disc bulge or herniation, or narrowing at L1-L2 and L2-L3; 3) mild diffuse posterior disc bulging and minimal bilateral foraminal stenosis at L3-L4 and L4-L5; 4) mild circumferential disc bulging, and mild-moderate left foraminal narrowing at L5-S1. *Id.*

Plaintiff saw Dr. Wynne for pain management through the end of 2014. *See* Tr. 978-89. Each time, Plaintiff had tenderness to palpation and decreased range of motion in her lumbar spine. (Tr. 971, 979, 983, 987). She had mild difficulty rising from a seated position but moved about the room without difficulty. (Tr. 971, 978, 982, 987). She had normal motor strength. (Tr. 972 979, 983, 987). Her gait was "normal" (Tr. 983, 987) or "with a cane". (Tr. 972, 979).

Plaintiff also continued chiropractic treatment with Dr. Arny through the end of 2014. *See* Tr. 432-45, 720-35. She reported a pain level ranging from 6/10 to 8/10, and described the pain as aching, dull, tingling, sharp with movement, burning, and radiating down both legs. *See id.* Examinations revealed moderate to severe hypertonicicity in the bilateral lumbar region at the lumbosacral area, an antalgic lean forward, and mild to severe joint fixation on lumbar range of motion testing. *See id.*

At a mental health assessment in December 2014, Plaintiff reported homeschooling her son, who had behavioral problems. (Tr. 806, 809). On examination later that month, Plaintiff had full joint range of motion, and no pain and full range of motion in her spine. (Tr. 1085).

In January and February 2015, Plaintiff continued to see Dr. Wynne for pain management. *See* Tr. 958-69. Dr. Wynne noted Plaintiff rose from a seated position with mild difficulty, had tenderness to palpation in her lumbar spine as well as decreased range of motion, and ambulated with a cane. (Tr. 958-59, 962-63, 967-68).

In February 2015, Plaintiff told Dr. Seager that, since having a bladder device placed, she had pain in her right lower back when pressing on the area. (Tr. 1032). However, she also reported her low back pain was "controlled better since starting Wellbutrin". *Id.*

In March 2015, Plaintiff returned to Dr. Arny with an "acute exacerbation" of her back pain. (Tr. 737). She treated with Dr. Arny through July 2015. *See* Tr. 736-52. In March she rated

her pain as 9/10 (Tr. 736); this gradually decreased to 3/10 in July (Tr. 751). Examinations revealed moderate to severe hypertonicity, an antalgic lean forward, and mild to moderate joint fixation on lumbar range of motion testing. (Tr. 736-52).

Plaintiff also saw physical therapist Richard Tomsho, P.T., in March 2015. (Tr. 956). She reported pain ranging from 6/10 to 9/10, worse with walking or standing for more than five to ten minutes, sitting for more than fifteen to twenty minutes, bending, and lifting. *Id.* Mr. Tomsho noted reduced lumbar range of motion, reduced trunk, knee, and hip strength, and moderate restriction in hamstring and piriformis muscle flexibility. *Id.* Plaintiff had several subsequent physical therapy visits. (Tr. 936-45, 950-55). In March, Plaintiff ambulated with a standard cane and antalgic gait. (Tr. 954). In April, Mr. Tomsho noted Plaintiff "made some progress" with improvements in range of motion, strength, flexibility, and function. (Tr. 936). However, she still had limitations, and though her pain was slightly decreased, it was still significant. *Id.* In a July 2015 visit with Dr. Wynne, Plaintiff reported physical therapy decreased her lower back pain to 4/10. (Tr. 920).

Plaintiff treated with Dr. Wynne monthly from April to December 2015. *See* Tr. 889-935, 946-47. Dr. Wynne repeatedly found Plaintiff had difficulty rising from a seated position, tenderness to palpation and decreased range of motion in her lower back, negative straight leg raising tests, and an antalgic gait with a cane. *See id.* Dr. Wynne treated Plaintiff with epidural steroid injections for her back pain. (Tr. 893, 899, 909). Following the last injection in December, Plaintiff reported increased pain, and received additional medication. (Tr. 891).

Plaintiff also received several acupuncture treatments during 2015. *See* Tr. 1003-12. At times, Plaintiff reported a decrease in pain, and increase in ability to perform daily living activities as a result. (Tr. 1006-11).

Plaintiff also treated with podiatrist W. Joseph Schoeppner, D.P.M., during 2015. In September 2015, Plaintiff had bunion surgery on her right foot. (Tr. 776-79). Plaintiff used a splint and a walker post-operatively. (Tr. 782). On examination, Plaintiff had moderate to severe forefoot edema. *Id.* Dr. Schoeppner recommended a wheelchair due to Plaintiff's tendency to fall. *Id.* Three weeks post-operation, Plaintiff was in a wheelchair, reported she had removed her own cast, and had increased swelling, and heel pain. (Tr. 784). She spent "a significant [amount of] time on her feet". *Id.* She again had moderate to severe forefoot edema. *Id.* Dr. Schoeppner prescribed a boot to be worn at all times except when bathing; she was not to bear weight. *Id.* At her next visit, Plaintiff admitted to walking on the surgical shoe and presented with a cane, "but full weightbearing on the right foot". (Tr. 786). Plaintiff had continued edema, and Dr. Schoeppner advised her to remain compliant with her post-operative instructions, specifically limiting the amount of time on her feet. *Id.* At her next visit, Dr. Schoeppner noted Plaintiff "ha[d] essentially been walking her entire postoperative course" and noticed swelling and pain at the end of the day. (Tr. 788). She ambulated with a cane, and Dr. Schoeppner again emphasized limiting the amount of time on her feet. *Id.* At a November 2015 visit, Plaintiff reported aching pain, but had continued walking in her boot; she again presented with a cane. (Tr. 790). Because x-rays showed increased gapping and screws backing, Dr. Schoeppner ordered a wheelchair so Plaintiff would be non-weightbearing. *Id.* In December, Plaintiff had been non-weightbearing for 85 to 90% of the time, but was using a Roll-A-Bout instead of a wheelchair due to lack of insurance coverage. (Tr. 792). Dr. Schoeppner prescribed two weeks of non-weightbearing status and then to increase activities as tolerated. *Id.* At the end of December, Plaintiff had progressed to full weightbearing in athletic shoes, but still had some discomfort and swelling with increasing activities. (Tr. 794). She reported

she had been very active, specifically that she went deer hunting and dragged her deer from the woods. *Id.* Dr. Schoeppner noted Plaintiff could continue to increase activities as tolerated. *Id.*

A January 2016 CT scan of Plaintiff's lumbar spine showed mild central canal stenosis and mild to moderate left-sided bony neural foraminal narrowing at L5-S1. (Tr. 1120). At L4-L5 and L3-L4, there was a posterior disc bulge resulting in mild central canal stenosis; at L2-L3, there was very slight central canal stenosis. *Id.*

Plaintiff returned to Dr. Wynne in January 2016 regarding her back pain. (Tr. 885-88). She reported increased lower back pain over the past week affecting her mobility. (Tr. 885). Plaintiff rose from a seated position with significant difficulty, and her gait was slow, with a cane. (Tr. 885-86). She had tenderness to palpation in her lumbar spine, and decreased range of motion. (Tr. 886). Dr. Wynne noted similar physical findings in February 2016. (Tr. 881-82). Plaintiff underwent a trial spinal cord stimulator implant in February 2016. (Tr. 878-79). Plaintiff reported significant pain relief, and Dr. Wynne referred her for a permanent implant. (Tr. 874-76).

In February 2016, Dr. Schoeppner noted Plaintiff reported discomfort and swelling with increasing activities, but had been "very active throughout the entire recovery phase". (Tr. 796).

*Opinion Evidence*

In March 2014, state agency physician Steve E. McKee, M.D., reviewed Plaintiff's medical records. (Tr. 81-83). He opined Plaintiff could perform the sitting, standing, walking, lifting, and carrying requirements of light work. (Tr. 81). He limited postural movements to frequent climbing of ramps and stairs, balancing, and crouching, occasional stooping, kneeling, and crawling, and never climbing ladders, ramps, or scaffolds. (Tr. 81-82). He also opined Plaintiff should avoid all exposure to hazards such as machinery and heights, and avoid concentrated exposure to vibration. (Tr. 82).

In August 2014, state agency physician John L. Mormol, M.D., reviewed Plaintiff's records and affirmed Dr. McKee's conclusions. (Tr. 110-12)

VE Testimony

A VE also appeared and testified at the hearing before the ALJ. (Tr. 68-73). The ALJ asked the VE to consider a hypothetical individual of Plaintiff's age, education, and past work experience who was limited in the way in which the ALJ ultimately found. (Tr. 68-70). The VE responded that such an individual could not perform Plaintiff's past work, but could perform other jobs such as table worker, final assembler, or bonder. (Tr. 69-70).

ALJ Decision

In her written decision dated June 2. 2016, the ALJ found Plaintiff met the insured status requirements of the Social Security Act through December 31, 2017, and had not engaged in substantial gainful activity since her alleged onset date of September 7, 2012. (Tr. 22). Plaintiff had severe impairments of degenerative disc disease of the cervical and lumbar spine, obesity, bunions, and depression, but none of these impairments – individually or in combination – met or equaled a listed impairment. (Tr. 22-23). The ALJ then concluded Plaintiff had the physical residual functional capacity:

> to perform sedentary work as defined in 20 CFR 404.1567(a) and 416.967(a) except that [she] may frequently reach overhead with the bilateral upper extremities; [she] may occasionally balance, stoop, kneel, crouch, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; [she] may occasionally be exposed to vibration, but may never be exposed to extreme cold, or to workplace hazards, including unprotected heights, dangerous moving machinery or operation of a motor vehicle[.]

(Tr. 25).[3] The ALJ found Plaintiff could not perform any past relevant work but could perform other work. (Tr. 31-32). Therefore, the ALJ found Plaintiff not disabled from September 7, 2012 through the date of her decision. (Tr. 32).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a) & 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A).

---

3. The RFC also contains mental restrictions not at issue here. *See* Tr. 25.

The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520 and 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f) & 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises three challenges to the ALJ's decision. First, she contends the ALJ erred in her analysis of Listing 1.04C. Second, she contends the ALJ erred in her evaluation of Plaintiff's RFC. And finally, Plaintiff contends the ALJ erred in her analysis of Plaintiff's subjective symptom reports / credibility. The Commissioner responds that the ALJ's decision comported with

applicable legal requirements, is supported by substantial evidence, and should be affirmed. For the reasons discussed below, the undersigned affirms the Commissioner's decision.

Listing 1.04C

Plaintiff contends the ALJ erred in finding she did not meet Listing 1.04C. Specifically, she argues the ALJ's determination that could "ambulate effectively" is not supported by substantial evidence. The undersigned finds no error in the ALJ's listing determination.

Plaintiff bears the burden at Step Three of establishing that her impairments meet or medically equal a listing. *See Buress v. Sec'y of Health & Human Servs.*, 835 F.2d 139, 140 (6th Cir. 1987); *Bingaman v. Comm'r of Soc. Sec.*, 186 F. App'x 642, 645 (6th Cir. 2006). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). In other words, a claimant who meets or medically equals the requirements of a listed impairment will be deemed conclusively disabled. *See Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). "A claimant must satisfy all of the criteria to meet the listing," *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009), and all of these criteria must be met concurrently for a period of at least twelve continuous months. *See* 20 C.F.R. §§ 404.1525(c)(3)-(4), 404.1509, 416.925(c)(3)-(4), 416.90; 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00(D) ("Because abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation."); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990) ("For a claimant to show that his impairment matches a listing, it must meet *all* of the specified medical criteria. An impairment that manifests only some of those criteria, no matter how severely, does not qualify."); *Blanton v. Soc.*

*Sec. Admin.*, 118 F. App'x 3, 6 (6th Cir. 2004) ("When all the requirements for a listed impairment are not present, the Commissioner properly determines that the claimant does not meet the listing.").

Plaintiff argues that the ALJ erred by failing to find that her condition meets or equals Listing 1.04, subsection C, which involves disorders of the spine that result in "compromise of the nerve root . . . or the spinal cord." 20 C.F.R. Pt. 404, Subpt. P, App'x 1. The claimant must also demonstrate the following to meet subsection C of this listing:

> Lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

*Id*. Listing 1.00B2b defines the inability to ambulate effectively as "an extreme limitation of the ability to walk" and "is defined generally as having insufficient lower extremity functioning . . . to permit independent ambulation without the use of a hand-held assistive device[] that limits the functioning of both upper extremities." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, Listing 1.00B2b(1). By contrast, the listings describe the ability to ambulate effectively as follows:

> To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

*Id.* at Listing 1.00B2b(2).

At Step Three of her analysis, the ALJ explained:

No treating or examining physician has indicated findings that would satisfy the severity requirements of any listed impairment. In reaching the conclusion that the claimant does not have an impairment or combination of impairments that meet or medically equal a listed impairment, consideration was also given to the opinion of the State Agency medical consultants who evaluated this issue at the initial and reconsideration levels of the administrative review process and reached the same conclusion . . . . All of the listings were considered in reaching this finding, with specific emphasis on listings 1.02, 1.04 and 12.04.

Relevant to listings 1.02 and 1.04, the record does not indicate that the claimant is unable to ambulate effectively. The claimant has been prescribed wheelchair and cane following various surgeries (2E/8), yet the record offers indications of a normal gait, with and without a cane (4F/17), (15F/90). In addition, the claimant's podiatrist notes that the claimant has been walking for essentially the whole of her post-operative course, despite recommendations to the contrary (13F/34).

(Tr. 23).[4]

The undersigned finds the ALJ's determination regarding Listing 1.04C supported by substantial evidence. The ALJ's determination is supported by the records cited and other evidence in the record.. At a November 2013 visit, Dr. Miller noted Plaintiff's gait was "normal without list or antalgia" and that she had full strength in her spine. (Tr. 399). Similarly, at a February 2015 visit with Dr. Wynne, Plaintiff was noted to have normal muscle strength bilaterally, and her gait was "with a cane." (Tr. 959). Dr. Wynne also repeatedly noted Plaintiff moved around the room without difficulty. *See* Tr. 958-59, 962-63, 967-68, 971, 978, 982, 987, 991, 995, 999. At times Dr. Wynne noted a normal gait (Tr. 983, 987, 991, 995, 1000), and at times she noted the use of a cane, sometimes with a notation to an antalgic gait, sometimes without, (Tr. 890, 896, 902, 906, 913, 917, 923, 926, 929, 933, 959, 963, 967, 972, 979). Further, the ALJ correctly cited Dr.

---

4. Although the ALJ addressed both Listings 1.02 and 1.04 in her analysis (Tr. 23), and the Commissioner addresses both in her brief (Doc. 15, at 10-14), Plaintiff only presents argument regarding Listing 1.04C (Doc. 14, at 17-19, Doc. 16, at 1-5), thus the undersigned addresses only that Listing. *See McPherson v. Kelsey*, 125 F. 3d 989, 995 (6th Cir. 1997) ("Issues averted to in only a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.") (internal quotation and citation omitted).

Schoeppner's notation that Plaintiff "ha[d] essentially been walking her entire postoperative course" after bunion surgery (Tr. 788); *see also* Tr. 784 ("patient does confirm that she has spent a significant time on her feet/with her foot dependent."); Tr. 786 ("Patient . . . admits to walking on the surgical shoe[.]"); Tr. 794 ("Patient states she's progress[ed] to full weightbearing in athletic shoes, still has some discomfort and swelling with increasing activities, has been very active, states that she did go deer hunting and drag the deer out of the woods that she killed."); Tr. 796 ("Patient states she's progress[ed] to full weightbearing in athletic shoes, stil[l] has discomfort and swelling with increasing activities, has been very active throughout the entire recovery phase."). In December 2014, on examination for another issue, a physician noted Plaintiff had full joint range of motion, and no pain and full range of motion in her spine. (Tr. 1085). Further, as the ALJ pointed out later in her decision (Tr. 29), Plaintiff reported to a consultative examiner that she was able to attend to her own person hygiene and did some cooking and cleaning (Tr. 453).

Although Plaintiff is correct that there are notations in the record to the use of ambulatory aids and an antalgic or slow gait, the use of a single cane or some gait abnormality is alone insufficient to establish ineffective ambulation. *See, e.g.*, *Brown v. Berryhill*, 2018 WL 3548843, at *18 (N.D. Ohio) ("[D]istrict courts within this circuit have consistently found that use of a single cane or crutch does not establish an inability to walk effectively for the purposes of Listing 1.02(A), 1.03, and 1.04C.") (collecting cases). The ALJ also acknowledged more restrictive findings the record. (Tr. 23) ("The claimant has been prescribed wheelchair and cane following various surgeries[.]"). However, the wheelchair was prescribed temporarily by Dr. Schoeppner to ensure Plaintiff was non-weightbearing after bunion surgery. *See* Tr. 790. Further, there was evidence in the record of Plaintiff using a walker, but these were: 1) two weeks after back surgery (Tr. 472); and 2) several months later between two close-in-time hospitalizations for a surgical

wound infection and kidney failure (Tr. 1041). The record does not support finding Plaintiff used either a walker or a wheelchair for a twelve-month period. *See* 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing 1.00B2a ("The inability to ambulate effectively . . . must have lasted, or be expected to last, for at least 12 months.").

Therefore, although the record certainly demonstrates limitations on Plaintiff's ability to ambulate, the ALJ's determination that such limitations do not rise to the level of an "extreme limitation in the ability to walk", 20 C.F.R. Pt. 404, Subpt. P, App'x 1, Listing1.00B2b, is supported by substantial evidence. This is so even though Plaintiff can point to evidence in the record suggesting a contrary conclusion. *Jones*, 336 F.3d at 477.

RFC

Plaintiff next argues the ALJ's RFC determination is not supported by substantial evidence because 1) no opinion evidence supports the RFC; and 2) the record supports greater restrictions in walking and standing than permitted by the RFC. The Commissioner responds that the RFC is supported by substantial evidence and should be affirmed.

An individual's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). In making this determination, the ALJ must consider all relevant evidence in the case record. *Id.*; SSR 96–8p, 1996 WL 374184, at *5. This evidence includes medical records, opinions of treating physicians, and the claimant's own description of her limitations. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Social Security Act instructs that the ALJ—not a physician—ultimately determines a claimant's RFC. 42 U.S.C. § 423(d)(5)(B); *see also Nejat v. Comm'r of Soc. Sec.,* 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."); 20 C.F.R. §§

404.1546(c), 416.946(c) ("[T]he administrative law judge . . . is responsible for assessing your residual functional capacity.").

Plaintiff first argues that the RFC is not supported by medical opinion evidence. This is true, as the only opinion evidence in the record limited Plaintiff to *light* rather than *sedentary* work. *See* Tr. 81-83, 110-12. However, as Plaintiff acknowledges, an RFC determination is reserved to the Commissioner. *See* Doc. 14, at 19 (noting it "is not an error *per se*" for the RFC to differ from medical opinion evidence); *see also Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-43 (6th Cir. 2017) ("An RFC is an 'administrative finding,' and the final responsibility for determining an individual's RFC is reserved to the Commissioner.") (quoting SSR 96-5p, 1996 WL 374183, at *1–2); *Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ. . . . We similarly find no error here. The ALJ undertook a laborious evaluation of the medical record when determining the residual functional capacity, and substantial evidence supports the ALJ's conclusions.").

Specifically, Plaintiff contends the record supports greater limitations on standing and walking than identified by the ALJ.[5] However, the undersigned finds the ALJ's RFC determination supported by substantial evidence. Specifically, the ALJ noted that "[c]linical examinations included in the record have consistently, albeit not universally, reported no more than mildly adverse findings[.]" (Tr. 26). This is supported by the records cited. *See* Tr. 399 (November 2013

---

5. Sedentary work includes some standing and walking. The full range of sedentary work contemplates that "periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday and sitting should generally total approximately 6 hours of an 8-hour workday". SSR 83-10, 1983 WL 31251, at *5.

– normal gait, normal back strength, and negative straight leg raising tests, but tenderness to palpation and limited lumbar range of motion); Tr. 958-59 (February 2015 – mild difficulty rising from a seated position and moving around the room without difficulty, but tenderness to palpation and reduced lumbar range of motion); Tr. 1025 (September 2015 – normal range of motion and strength in upper extremities); Tr. 882 (February 2016 – normal lower extremity strength, symmetrical (but reduced) reflexes, and negative straight leg raising test, but decreased range of motion and tenderness in lumbar spine). And it is further supported by other evidence in the record. At times, Plaintiff was noted to have a normal gait. *See* Tr. 399 (November 2013); Tr. 1000 (June 2014); Tr. 991 (July 2014); Tr. 995 (July 2014); Tr. 987 (September 2014); Tr. 983 (October 2014). And although she frequently had tenderness and a reduced range of motion in her lumbar spine, and mild difficulty rising from a seated position, she was also frequently noted to move around a room without difficulty. *See* Tr. 958-59, 962-63, 967-68, 971, 978, 982, 987, 991, 995, 999.

Moreover, the ALJ reasonably relied on the only opinion evidence in the record—from the state agency physicians—that indicated Plaintiff could perform light work. (Tr. 29). She assigned these opinions "partial weight", noting they were well-supported by the record, and that agency physicians are "well versed in the terminology and analytical framework employed in the disposition of [disability] claims." *Id.* This is a valid rationale. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants and other program physicians, psychologists, and other medical specialists are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation."); 20 C.F.R. §§ 404.1527(c)(4), 416.927(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). The ALJ found, however, that complications from back and bunion surgery

"suggest[ed] additional adversities not considered by these consultants", and thus found a reduction to sedentary work warranted. (Tr. 29-30). Although the ALJ ultimately found Plaintiff more limited than these physicians opined, their opinions provide support for the ALJ's conclusion that Plaintiff was capable of some level of work.

The ALJ also considered Plaintiff's activities, and indications in the record suggesting she was more capable than she alleged. Specifically, the ALJ cited Dr. Schoeppner's notations that Plaintiff "ha[d] essentially been walking her entire postoperative course" in November 2015, and that she had "been very active, stat[ing] that she did go deer hunting and drag the deer out of the woods that she killed" (Tr. 794). *See* Tr. 29. These records provided support for the ALJ's determination that Plaintiff was capable of a reduced range of sedentary work. Moreover, as discussed in greater detail below, the ALJ discussed Plaintiff's subjective allegations and explained why he found them not entirely supported.

Finally, Plaintiff's argument that the ALJ erred in failing to include use of an assistive device in the RFC is not well-taken. Social Security Ruling 96-9p provides:

> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information.

1996 WL 374185, at *7.

In this case, although providers noted Plaintiff's use of a cane at times (*see* Tr. 346, 454, 886, 890, 896, 926, 929, 933, 954, 972), Plaintiff points to no statement in the record establishing that the cane was prescribed for long term use, medically required, or describing the circumstances for which it was needed. As such, the ALJ did not err in failing to include such a limitation in the RFC. *See Tripp v. Astrue*, 489 F. App'x 951, 955 (7th Cir. 2012) (noting that a finding of medical

necessity of an assistive device requires a statement of the circumstances in which it is needed and that other circuits "have required an unambiguous opinion from a physician stating the circumstances in which an assistive device is medically necessary"); *Salem v. Colvin*, 2015 WL 12732456, at *4 (E.D.M.I.) ("Neither the cane prescription nor treatment records . . . indicate the circumstances in which Salem might require the use of a cane. As such, Salem's argument that the need for a cane might erode the occupational base of sedentary work is without support.") (transcript citation omitted); *Mitchell v. Comm'r of Soc. Sec.*, 2014 WL 37382790, at *13 (N.D. Ohio) ("As there is no medical documentation establishing that Mitchell required the use of a cane and describing the circumstances when it is needed, the ALJ did not err by omitting the use of a cane from his hypothetical questions to the vocational expert."); *see also Carreon v. Massanari*, 51 F. App'x 571, 575 (6th Cir. 2002) ("Because the cane was not a necessary device for claimant's use, it cannot be considered an exertional limitation that reduced her ability to work.").

Although Plaintiff can certainly point to evidence in support of a more restrictive RFC, this Court's review standard dictates that even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones*, 336 F.3d at 477. Substantial evidence supports the ALJ's determination here, and it is therefore affirmed.

<u>Credibility / Subjective Symptom Reports</u>[6]

Last, Plaintiff argues the ALJ applied an incorrect legal standard in evaluating Plaintiff's credibility / subjective symptom reports. The Commissioner responds that the ALJ did not err.

The relevant Social Security regulations make clear that a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. §§ 404.1529(a), 416.929(a); *see also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)); *Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 989 (6th Cir. 2009). Instead, a claimant's assertions of disabling pain and limitation are evaluated under the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531. In determining whether a claimant has disabling symptoms, the regulations require an ALJ to consider certain factors including: 1) daily activities; 2) location, duration, frequency, and intensity of pain or symptoms; 3) precipitating and aggravating factors;

---

6. Social Security Regulations previously used the term "credibility" for evaluating a Plaintiff's subjective report of symptoms. *See* SSR 96-7p, 1996 WL 374186. In March 2016, the Social Security Administration issued new Social Security Ruling 16-3p, which eliminated "'the use of the word 'credibility' . . . to 'clarify that the subjective symptoms evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016) (quoting SSR 16-3p). Both SSR 96-7p and SSR 16-3p direct the ALJ to evaluate an individual's subjective report of symptoms with the factors listed in 20 C.F.R. §§ 404.1529 and 416.929. SSR 16-3p, 2016 2017 WL 5180304, at *7-8; 1996 WL 374186, at *2. Thus, while the term "credibility" was eliminated, prior case law is still applicable. *See Pettigrew v. Berryhill*, 2018 WL 3104229, at *14 n.14 (N.D. Ohio) ("While the court applies the new SSR, it declines to engage in verbal gymnastics to avoid the term credibility where usage of the term is most logical. Furthermore, there is no indication that the voluminous case law discussing and applying the credibility or symptom analysis governed by SSR 96–7p has been invalidated by SSR 16–3p."), *report and recommendation adopted by* 2018 WL 3093696.

4) the type, dosage, effectiveness, and side effects of any medication; 5) treatment, other than medication, to relieve pain, 6) any measures used to relieve pain, and 7) other factors concerning functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 16-3p, 2017 WL 5180304, at *7 ("In addition to using all of the evidence to evaluate the intensity, persistence, and limiting effects of an individual's symptoms, we will also use the factors set forth in 20 CFR 404.1529(c)(3) and 416.929(c)(3)."). Although the ALJ must "consider" the listed factors, there is no requirement that the ALJ discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009). The ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman v. Comm'r of Soc. Sec.*, 105 F. App'x 794, 800-01 (6th Cir. 2004) (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference." *Id.* (citing *Walters*, 127 F.3d at 531); *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 536 (6th Cir. 2001) (quoting *Myers v. Richardson*, 471 F.2d 1265, 1267 (6th Cir. 1972) ("[i]t [i]s for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony")). It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand. In fact, the Sixth Circuit has stated "an administrative law judge's credibility findings are virtually unchallengeable." *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (citation omitted). The Court is thus limited to determining whether the ALJ's reasons are supported by substantial evidence. *See Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713-14 (6th Cir. 2012) ("As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]").

The undersigned finds no error in the ALJ's application of this standard. Plaintiff specifically objects to the ALJ's statement that "the record, when considered as a whole, is not supportive of the contention that the existence of these impairments would be preclusive of all types of work." (Doc. 14, at 21) (quoting (Tr. 26). However, "[a]llegations of pain . . . do not constitute a disability, unless the pain is of such a debilitating degree that it prevents an individual from participating in substantial gainful employment." *Bradley v. Sec'y of Health & Human Servs.*, 862 F.2d 1224, 1227 (6th Cir. 1988). That is what the ALJ determined here – Plaintiff's pain was not so debilitating as to prevent her from engaging in a range of sedentary employment.

Moreover, the ALJ cited the appropriate standard and determined Plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. 25). Throughout her decision, the ALJ discussed several of the required factors, including Plaintiff's daily activities (Tr. 29) and treatment history (Tr. 26-27). *See* 20 C.F.R. §§ 404.1529(c), 416.929(c). In evaluating the credibility of Plaintiff's statements, the ALJ also noted Plaintiff "made inconsistent statements on issues central to resolution of [her] claims." (Tr. 29). Specifically, she pointed to contradictions between Plaintiff's statements in a function report that she required help with personal hygiene and grooming and did not prepare any meals (Tr. 290-91), and her statements to a consultative examiner that she was able to attend to her own personal hygiene and did some cooking (Tr. 453). (Tr. 29). Additionally, the ALJ noted Plaintiff's indication in a function report she could walk no more than thirty or forty steps (Tr. 294), was contradicted by Dr. Schoeppner's notes that Plaintiff "ha[d] essentially been walking her entire postoperative course" (Tr. 788) and had been able to "go deer hunting and drag the deer out of the

woods that she killed" (Tr. 794)[7]. (Tr. 29). Such contradictions are a valid reason to discount credibility, *see Walters*, 127 F.3d at 531; as is noncompliance with prescribed treatment, SSR 16-3p, 2017 WL 5180304, at *9 ("if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record"). Although the non-compliance related to Plaintiff's bunion surgery recovery, rather than her back impairment, it provided evidence that Plaintiff was more capable than she subjectively alleged.

The ALJ here "cited substantial, legitimate evidence to support [her] factual conclusions" regarding Plaintiff's subjective symptoms statements and this Court is therefore "not to second-guess". *Ulman*, 693 F.3d at 713-14. The Court therefore finds no error in the ALJ's evaluation of Plaintiff's subjective symptom reports.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB and SSI supported by substantial evidence and affirms that decision.

 s/James R. Knepp II
United States Magistrate Judge

---

7. Although Plaintiff offered a different explanation regarding this activity at the hearing (Tr. 63-65), the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record." *Workman*, 105 F. App'x at 800-01.